UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA NORTHERN RAILWAY, | No. 2:24-cv-01899-DJC-JDP |
| Plaintiff, | |
| v. | ORDER ISSUING PRELIMINARY INJUNCTION |
| PORT OF WEST SACRAMENTO and RAMCON ENGINEERING & ENVIRONMENTAL CONSULTING, INC., | |
| Defendants. | |

Following the issuance of a Temporary Restraining Order, the Court now considers Plaintiff's Motion for a Preliminary Injunction pending resolution of this case. Plaintiff has provided sufficient evidence to show entitlement to a preliminary injunction under the "serious questions" test. As discussed below, there is a significant factual dispute between the Parties that may determine the outcome of Plaintiff's claims. If Plaintiff is ultimately able to establish the facts in its favor, then Plaintiff is likely to succeed on the merits. Considering the allegations in the Complaint and the facts in the record, the Court concludes that Plaintiff has established at least serious questions about the merits of its claims. Without issuance of a preliminary injunction, Plaintiff will be irreparably harmed, while Defendants have articulated no real hardship if the status quo is maintained for the duration of the

litigation. The balance of hardships, therefore, "tips sharply in the plaintiff's favor" warranting issuance of the injunction. The Court accordingly GRANTS the Motion for Preliminary Injunction.

## I. Background

### A. Factual Background

Plaintiff Sierra Northern Railway ("SNR"), a common carrier railroad, brings the present suit against the Sacramento-Yolo Port District (which appears to have been erroneously sued as the Port of West Sacramento) ("the Port"), a governmental independent special district, and the Port's tenant, Ramcon Engineering & Environmental Consulting, Inc. ("Ramcon") (collectively "Defendants") over Defendants' decision to revoke Plaintiff's alleged license to access its property via a route through the property leased by Ramcon, the "North Access route." (Compl. (ECF No 1) ¶¶ 3–5.) Plaintiff operates a railway transloading service in West Sacramento where it stores and transfers freight between railroads and other means of transportation. (*Id.* ¶ 12.) In order to effect its transloading services, Plaintiff alleges that it has historically used the North Access route. (*Id.* ¶¶ 16–17.)

Plaintiff acquired a parcel of land from the Port in 2012 where it houses its rail facilities. (*Id.* ¶ 13.) While the parcel included a deeded easement for an access route on the southern portion of the property, the "South Access route," the Port, through its General Manager Rick Toft, granted Plaintiff a license to access the property via the contested North Access route. He told Plaintiff's CEO, Kennan H. Beard, that SNR could use the route without restriction, removed the lock on the gate securing the road, and allowed Plaintiff to install its own lock on the gate. (*Id.* ¶¶ 1, 15.) In reliance on the license to utilize the North Access route, Plaintiff improved its land and built its rail facilities at the northern portion of its property, expending nearly $2,000,000. (*Id.* ¶ 16.) Plaintiff alleges that it thereafter began to use the North Access route to conduct its operations. (*Id.* ¶¶ 16–17.)

////

After constructing the rail facilities, and in apparent reliance on the use of the North Access route, in 2023 Plaintiff leased a parcel of land at the southern portion of its property to a construction company, Flatiron Contractors, Inc. ("Flatiron"). (*Id.* ¶ 18.) The lease contract between Flatiron and Plaintiff grants Flatiron exclusive use of the southern portion of Plaintiff's property, including a pathway that connects the South Access route to Plaintiff's rail facilities on the north end of the property. (Beard Decl., (ECF No. 21-1) Ex. A at 1.) Accordingly, Plaintiff alleges, it cannot access its rail facilitates or carry out its operation except through the North Access route. (*Id.* ¶ 21.)

In May 2024, Defendants purported to revoke Plaintiff's license to use the North Access route, which became effective on July 10, 2024. (Ex Parte Appl. for TRO ("TRO App") (ECF No. 2) at 10 –11.) Without use of the North Access route, Plaintiff claims that it is unable to access its rail facilities and alleges that the lack of access will cause Plaintiff to substantially cease its shipping activities. (*Id.* at 17.) Plaintiff has filed the present suit requesting a declaratory judgement that Defendants' actions are preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. §§10101 et seq., seeking to quiet title to the route and equitably estop Defendants from revoking the license, and asserting violation of 42 U.S.C. § 1983 against the Port for unlawful taking in violation of the Fifth and Fourteenth Amendments.

**B. Procedural Background**

On July 11, 2024, Plaintiff filed an Ex Parte Application for a Temporary Restraining Order to restore Plaintiff's movement through the North Access route. (TRO App. at 1.) The Court held a hearing on July 12, 2024, with David Diepenbrock appearing for Plaintiff and Lauren Jones and Jeff Mitchell appearing for the Port. Defendant Ramcon did not appear at the hearing. At the conclusion of the hearing, the Court granted the Application for a Temporary Restraining Order, (ECF No. 11), and later issued a written order (ECF No. 13).

////

Pursuant to the briefing schedule set by the Court, Plaintiff filed the instant Motion for Preliminary Injunction (Mot. Prelim. Inj. ("PI Mot.") ECF No. 14), Defendants filed Oppositions (Def. the Port's Opp'n (ECF No. 16); Def. Ramcon's Opp'n (ECF No. 18)), and Plaintiff filed a Reply (ECF No. 21).  The Court held oral argument on the Motion on July 25, 2024 with David Diepenbrock and William Scott Cameron appearing for Plaintiff, Lauren Jones appearing for Defendant the Port, and Kristen Renfro appearing for Defendant Ramcon.  At the conclusion of the hearing, the Court extended the Temporary Restraining Order for an additional fourteen (14) days and took the matter under submission.

## II.     Legal Standard for Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Ninth Circuit also recognizes the "serious questions" test which is a type of sliding scale test.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Under the sliding scale, "a stronger showing of one element may offset a weaker showing of another."  *Id*.  "For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits."  *Id*.  Accordingly, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *Id*. at 1134–35.  After *Winters*, in order to meet the serious questions test, the Plaintiff must also make a showing of irreparable injury and public interest.  *Id.*

////
////
////
////

### III. Discussion

#### A. Likelihood of Success on the Merits

##### i. Plaintiff's License to the North Access

As an initial matter, at this stage of the proceedings the evidence supports a finding that General Manager Toft granted a license to Plaintiff to use the North Access route. A license is a grant of authority "to perform an act or acts on the property of another pursuant to the express or implied permission of the owner" which would otherwise be considered trespassing. 6 Miller & Starr Cal. Real Est. (4th ed.) § 15:2. While he does not use the word "license," in his declaration, Toft states that he granted Plaintiff permission to use the North Access route. (Toft Decl. (ECF No. 16) ¶ 11.) Toft does not dispute that he then proceeded to remove the lock on the gate to the North Access route and allow Plaintiff to replace the lock with a rail lock. This was an express grant of permission for Plaintiff to use the North Access route, i.e., a license to use the route.

Even if Toft did not have the authority to grant a license on behalf of the Port, a license may be found without the express permission of the licensor where it is "exercised with the licensor's knowledge and under such circumstances as would prompt a reasonable person to object." 6 Miller & Starr Cal. Real Est. (4th ed.) § 15:2. As Plaintiff asserts, it used the access route openly and regularly, and Defendants did not object to Plaintiff's use of the route for a number of years. While Defendants dispute the frequency and exclusively of Plaintiff's use of the license, Defendants have not disputed that Plaintiff did utilize the route openly and maintained their own lock on the gate since 2019. Accordingly, the Port had knowledge that Plaintiff was exercising a license, and effectively ratified the license by failing to object to it.

***Irrevocable License***

While a license is ordinarily revocable at will, it becomes irrevocable as an equitable remedy "when the licensee, acting in good faith under the terms of the instrument, constructs valuable improvements on the property, making it unjust to

5

permit the cancellation [of the license] . . . ."  *Belmont Cnty. Water Dist. v. State of California*, 65 Cal. App. 3d 13, 17 (1976).  In order for a license to be considered irrevocable under these equitable estoppel principles, it must be unjust to allow the license to be revoked.  *Gamerberg v. 3000 E. 11th St., LLC*, 44 Cal. App. 5th 424, 430 (2020).  Similarly, the license is only irrevocable "for so long a time as the nature of it calls for."  *Stoner v. Zucker*, 148 Cal. 516, 520, 83 P. 808, 810 (1906); *accord Richardson v. Franc*, 233 Cal. App. 4th 744, 757–58 (2015).

It follows from these principles that where the licensee would suffer no substantial loss, or where the circumstances no longer necessitate the license, the licensee would not be entitled to the equitable remedy.  *Broads v. Mead*, 159 Cal. 765, 768, 116 P. 46, 47 (1911).  Defendants argue that Plaintiff's license should not be considered irrevocable because it would not be unjust to revoke the license for two related reasons: (1) the improvements were not made to the licensed land itself, and (2) Plaintiff maintains the ability to access the improvements it made to its own land through the South Access route such that it is not losing the value of the improvements it made.

While Defendant is correct that many cases have found an irrevocable license where the improvements were made to the licensed land itself, that is not a requirement for an irrevocable license.  A licensee must expend valuable resources in furtherance of and in reliance on the license, but not necessarily on the licensed property. *Gamerberg*, 44 Cal. App. 5th at 430.  Courts have found irrevocable licenses where licensees made improvements to their own land in reliance on the license because revocation of the license would prevent the licensee from enjoying the benefit of their expenditure.  As one California court put it, "[i]n the paradigmatic case, a landowner allows his neighbor the right to use some portion of his property – often a right-of-way or water from a creek – knowing that the neighbor needs the right to develop his property.  The neighbor then builds a house, digs an irrigation ditch, paves the right-of-way, plants an orchard, or farms the land in reliance on the

6

landowner's acquiescence." *Richardson v. Franc*, 233 Cal. App. 4th 744, 751–52 (2015); *see, e.g.*, *Higgins v. Kadjevich*, 186 Cal. App. 2d 520, 521 (1960) (plaintiff established irrevocable license to use a pipeline where plaintiff built an extension of the pipeline running to the well on plaintiff's property in reliance on the license to use the main pipeline).

      Here, Plaintiff has provided evidence that it made valuable improvements on its property in reliance on the license to use the North Access facility. After being granted the license, Plaintiff spent nearly $2 million on installation of its rail facilities on the northern portion of its property close to the North Access route. That Plaintiff chose to install the facilities there instead of installing them on the southern portion of the property near the South Access route evinces its reliance on the license. These improvements are sufficient to support a finding of irrevocable license.[1]

      That the valuable improvements are on Plaintiff's property and not on the licensed route does, however, factor into whether Plaintiff will be able to enjoy the benefit of its expenditures if the license were revoked. The parties fundamentally disagree about whether Plaintiff maintains access to the rail facilities through the South Access route. In his declaration, Rollo Stephens, the Construction Manager for Defendant Ramcon, attests that he is regularly on the property adjacent to Plaintiff's property, and has observed Plaintiff's activities on the property over the years. (Stephens's Decl. (ECF No. 17) ¶ 3.) He states that Plaintiff did not historically use the North Access route, and that only recently, in May 2024, did it begin to use the North Access route as a regular means of ingress. (*Id.* ¶¶ 3, 7–9.) To facilitate this route, SNR placed signs directing SNR traffic to the North Access route for the first time in May 2024. (*Id.* ¶ 8.) Stephens stated that he has not observed any physical barrier to

---

[1] In his declaration, Beard attests that Plaintiff did make improvements to the North Access route as well, stating that "SNR removed the weeds, graded the road to remove the potholes, and then added road base so it would not become muddy" and that SNR continues to maintain the road. (Beard Decl. ¶ 12.) However, Plaintiff fails to allege that these improvements were valuable sufficient to support its claim to an irrevocable license.

accessing the northern portion of Plaintiff's property from the South Access route and through the portion of the property leased by Flatiron. (*Id.* ¶ 10.) Defendants have also provided photographs of the southern portion of Plaintiff's property which Toft has declared accurately depict the current state of the property. (Toft Decl. ¶ 30; Exs. H and I (ECF No. 25).) These photographs depict a physically unencumbered pathway from the South Access through the portion of the property leased by Flatiron to Plaintiff's rail facilities. At oral argument, Plaintiff did not contest that the pathway is physically unencumbered with the exception of movable construction equipment.

Plaintiff disputes Stephens's and Toft's assertions that Plaintiff's use of the North Access is new, and disputes whether the route through the Flatiron property provides a means of access. Beard attests that Plaintiff has exclusively used the North Access route to conduct its operations since it installed its rail facilities on the property in 2019. (Beard Decl. ¶ 11.) Beard attests that the loop described by Stephens – wherein both SNR and Flatiron have used the North Access route as a means of ingress and the South Access route as a means of egress – was only temporary and is not a feasible option for Plaintiff's continued operations. (*Id.* ¶ 10.) He declares that the route was used in a limited capacity while the Port made improvement on the South Access road, describing the path as a "temporary route that ran through the area Flatiron has leased from SNR," which "is narrow and ungraded, uncompacted, and is mostly just dirt, without any gravel." (*Id.*) Beard further attests that "[s]ignificant work would have to be performed to make it a viable route for SNR's employees and customers." (*Id.*) Accordingly, this route may not be a feasible means for Plaintiff to access and enjoy the benefit of the improvements it made to the northern portion of its property.

Defendants further contest Plaintiff's assertion that it is legally precluded from using the South Access route under the terms of its lease with Flatiron. Defendants include the application submitted by Flatiron to the City of West Sacramento for a temporary use permit in February 2024 which states that, per the terms of the lease

8

agreement between Flatiron and Plaintiff, Flatiron is not allowed to operate when the railway is operating at the entrance, and is required to coordinate with Plaintiff's activities. (Toft Decl., Ex. E at 4.) Defendant argues that this representation by Flatiron contradicts Plaintiff's allegations that Flatiron has exclusive use of the leased portion of the property.

In response Plaintiff includes the agreement between Flatiron and SNR which states that Flatiron was granted exclusive use of the property by the leasing instrument. (Beard Decl., Ex. A at 1.) At the hearing, Plaintiff's counsel argued that Flatiron's representation in the use permit application refers to section 6 of the agreement which states that Flatiron will not interfere with Plaintiff's operations. (*See id.* at 2–3.) The Court does not see an inconsistency between the application to West Sacramento, which states that the lease prohibits Flatiron from operating when the railway is operating at the *entrance*, and Plaintiff's position that the lease does not permit it to drive across the leased property on a regular basis.

In sum, while Plaintiff has satisfactorily established reliance on the license, there is a factual dispute as to whether Plaintiff has a meaningful ability to access and enjoy the benefit of the improvements it made to the land, and whether revocation of the license would therefore be unjust such that the license is irrevocable. Given the factual showing at this stage, the Court concludes that Plaintiff has shown a serious question on the merits of its claim that it possesses an irrevocable license to the North Access route.

### Statute of Frauds

Defendants argue that any license Plaintiff purports to possess is invalid under the statute of frauds. The statute of frauds requires the conveyance of any interest in land for more than a period of a year to be made in writing, otherwise such agreement is unenforceable. *See* Cal. Civ. Code § 1624(a)(3). All parties concede that any agreement for the use of the North Access road was made orally and not in writing.

A license, however, is not a conveyance of land to which the statute of frauds

applies. Instead, as stated above, it is a grant of authority to *use* property for a purpose. 6 Miller & Starr Cal. Real Est. (4th ed.) § 15:2. A license is granted to an individual and does not run with the land. *Id.* It may be granted orally, and may even be granted without any express authorization of the licensor. *Id.* Thus, a license is not subject to the statute of frauds in the first instance.

An irrevocable license, which is finding based in equitable estoppel principles, is similarly not subject to the statute of frauds. 6 Miller & Starr Cal. Real Est. (4th ed.) § 15:2. Equitable estoppel is by its nature an exception to the statute of frauds:

> The doctrine of estoppel to assert the statute of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances. Such fraud may inhere in the unconscionable injury that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract.

*Monarco v. Lo Greco*, 35 Cal. 2d 621, 623, 220 P.2d 737 (1950). A license becomes irrevocable when the licensee can make this showing of reliance on the license and an injury if it is revoked. *Belmont Cnty. Water Dist.*, 65 Cal. App. 3d at 17 (a licenses becomes irrevocable "when the licensee, acting in good faith under the terms of the instrument, constructs valuable improvements on the property, making it unjust to permit the cancellation . . . ."). Thus, an irrevocable license is not within the purview of the statute of frauds. *See id.*; *Colvin v. S. Cal. Edison Co.*, 194 Cal. App. 3d 1306, 1312 (1987), *abrogated on other grounds by Ornelas v. Randolph*, 4 Cal. 4th 1095 (1993). Accordingly, the statute of frauds is not a defense to the finding of an irrevocable license.

### ii. ICCTA Preemption

Plaintiff contends that ICCTA preempts Defendant from revoking Plaintiff's license to use the North Access route because it would effectively cause an abandonment of a rail line and unreasonably interfere with railway transportation. "ICCTA contains an express preemption clause, which grants the U.S. Surface Transportation Board ("STB") exclusive jurisdiction over "transportation by rail carrier"

"as part of the interstate rail network." 49 U.S.C. § 10501(a); *Levin Richmond Terminal Corp. v. City of Richmond*, 482 F. Supp. 3d 944, 960 (N.D. Cal. 2020).

The statute defines rail transportation expansively to encompass any property, facility, structure, or equipment "related to the movement of passengers or property, or both, by rail, *regardless of ownership or an agreement concerning use*." 49 U.S.C. § 10102(9). (emphasis added) "Moreover, 49 U.S.C. § 10501(6) defines "railroad" broadly to include track, terminal facility, ground, etc., used or necessary for transportation." *Jie Ao and Xin Zhouf,* Petition for Declaratory Ord., No. FD 35539, 2012 WL 2047726, at *4 (June 4, 2012). Transloading facilities, like those operated by Plaintiff, are considered to be "rail carriers" and part of the rail transportation system under ICCTA. *See Levin Richmond Terminal Corp.*, 482 F. Supp. 3d at 961 (collecting cases); *Valero Ref. Company Petition for Declaratory Order*, No. FD 36036, 2016 WL 5904757, at *3 (S.T.B., Sept. 20, 2016) ("The [STB]'s jurisdiction extends to rail-related activities that take place at transloading (or, as here, off-loading) facilities if the activities are performed by a rail carrier . . . .").

ICCTA preemption may be categorical, preempting state laws that have "the effect of managing or governing rail transportation" or as applied, where the law "would have the effect of unreasonably burdening or interfering with rail transportation." *Levin*, 482 F. Supp. 3d at 961 (quoting *Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 413-14 (5th Cir. 2010)). ICCTA does not "preempt state or local laws if they are laws of general applicability that do not unreasonably interfere with interstate commerce." *Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010). Similarly, "[r]outine non-conflicting uses, such as non-exclusive easements for at-grade crossings, are not preempted, as long as they would not impede rail operations or pose undue safety risks." Whether a law unreasonably burdens rail transportation "involves a fact-bound case-specific determination.'" *Franks*, 593 F.3d at 413-14.

Although "general principles of state property and contract law [] cannot be said to [categorically] 'have the effect of manag[ing] or govern[ing] rail transportation,'" *Burgoyne, LLC v. Chicago Terminal R.R. Co.*, 169 N.E. 3d 815, 824 (Ill. App. 2020), "[t]he agency's broad and exclusive jurisdiction over railroad operations and activities prevents application of state laws that would otherwise be available" where the application of these laws would effectively cause an abandonment of rail lines or otherwise interfere with the railway's use of the land. *Jie Ao and Xin Zhouf*, 2012 WL 2047726, at *5. "ICCTA preemption does not depend upon the source of a state law claim" but on whether the "requested remedy will, in the words of the STB's governing test, 'impede rail operations . . . .'" *City of Ozark, Arkansas v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1172 (8th Cir. 2016). "Whether that interference with rail transportation arises from a public or private easement, or from opening a new crossing or restoring an abandoned crossing, is irrelevant to the federal preemption analysis." *Id.*

A rail line cannot be removed without authorization from the STB even if doing so would otherwise be warranted under the applicable state law because "a rail carrier cannot lawfully 'abandon any part of its railroad lines' or 'discontinue operation of all rail transportation *over any part of its railroad lines*' unless the STB 'finds that the present or future public convenience and necessity' are satisfied." *Ass'n of Am. Railroads v. Hudson*, No. 1:23-CV-815-DJN, 2024 WL 1626105, at *2 (E.D. Va. Apr. 15, 2024) (citing 49 U.S.C. § 10903(d)) (emphasis added); *see Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 145 (1946) (holding that rail lines cannot be removed without authorization even if their underlying leases have terminated). For example, in *Burgoyne*, the plaintiff attempted to terminate the railway's easement pursuant to the terms of the deed which provided that the easement would automatically terminate if not in use for twelve (12) consecutive months. 169 N.E. 3d at 821. The court found that termination of the easement would be an abandonment of the rail line because it would make it impossible for the railway to conduct rail services on the line, and that

ICCTA therefore preempted the action. *Id.* at 82. This was true even though the rail line was not actively in use. *Id.*; *see also Jie Ao and Xin Zhouf*, 2012 WL 2047726, at *5 (holding that adverse possession claim was preempted by ICTAA even though the rail line was not in current use because it would prevent potential future use of the rail line). Similarly, in *B & S Holdings, LLC v. BNSF Railway Company*, the plaintiff's adverse possession claim was preempted because the possession would "interfere with railroad operations, [and] would divest the railroad of the very property with which it conducts its operations." 889 F. Supp. 2d 1252, 1258 (E.D. Wash. 2012).

Defendant's revocation of the license to use the North Access route would be preempted by ICCTA if Plaintiff can prove that its operations are unreasonably burdened by the revocation. Plaintiff asserts that it has been using the licensed area to conduct its transloading operations (though the Parties disagree about whether it has been doing so exclusively), and has effectively established the route as a rail line over which it conducts its transloading activities. By revoking the license to use the rail line, Defendants' actions could have the effect of removing that portion of the rail line and discontinuing Plaintiff's operation over that rail line.

As discussed above, the parties disagree about whether Plaintiff is able to access its rail facilities and conduct its operation via the South Access road. The lease with Flatiron contemplates that Flatiron will comply with the laws, regulations, enactments, and rules of, among other entities, the STB, suggesting that the STB could order access over Flatiron's property rather than that of the Port, which might be a more equitable result given that Plaintiff acted to release its legal right to the South Access route. Even so, this appears to be an issue for the STB, and weighs in favor of finding ICCTA preemption. Further, even if Plaintiff is able to conduct operations using the South Access route, Plaintiff claims the route will need to be improved for year-round use, and therefore moving the operations may burden, at least temporarily, the railway's operations. Therefore, while the facts still need to be developed, the revocation of the license to use the North Access route may cause

unauthorized abandonment or unreasonably interfere with rail transportation such that the action falls under the preemptive scope of ICCTA.

### iii.  Section 1983 Claim

To establish a section 1983 cause of action against a municipality, the plaintiff must prove "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).  "[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury," *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) because "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  Liability under *Monell* may be premised on the decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision.  *See Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008); *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014).

Plaintiff argues that the Port deprived Plaintiff of its Fifth Amendment rights by revoking the license to use the North Access route without compensation because Plaintiff holds an irrevocable license to the North Access route.  An irrevocable license to enter and use land is the functional equivalent of an easement, *see Gramerberg*, 44 Cal. App. 5th at 433, and would therefore be a property interest for purposes of the Fifth Amendment, *see Leisnoi, Inc. v. United States*, 170 F.3d 1188, 1191 (9th Cir. 1999).  As discussed above, there are serious factual questions about whether the license to the North Access route is irrevocable.

Further, there is a serious question about whether Toft's actions can be imputed to the Port. The evidence provided by Defendants suggests that General Manager Toft, is not the "final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision." The Port is controlled by a governing body, the Port Commission, and operates according to a policy manual. The manual specifies that any contracts or agreement must be executed by the Chairman of the Port Commission, the CEO, or the designee of those entities. Specifically, only the Port CEO or designee "is authorized to grant rights, licenses, and/or permits for use of port facilitates and/or property in an amount not to exceed $100,000, (revenue), nor for a period exceeding five (5) years." (Toft Decl., Ex. J, at 1.) Any grant of a license for a term of more than five years must be approved by the Port Commission. (*Id.*) Accordingly, under the Port's official policies, General Manager Toft is not entrusted with the authority to grant licenses, and is therefore also unlikely to be the final authority with respect to revoking such a license.

Plaintiff contends that Toft's conduct shows that he is the designee of the Port CEO or Commission on the issue of granting licenses. Toft initially held himself out as having authority to grant the license to use the North Access route, and was able to remove the lock from the gate. Toft also negotiated the terms of a possible lease agreement for the access route. Prior to the revocation of the license, Beard and Toft had reached a tentative agreement on potential monthly rent for the North Access route. (Beard Decl. ¶ 9.) During these discussions, Toft did not mention that he needed any permission from the Commission or the CEO to enter into such an agreement. Toft was then the only party from the Port to communicate to Plaintiff about the decision to revoke the license. Further, in communications between Plaintiff and the Port concerning the revocation, the Port's counsel indicated that it would need to wait until Toft was back from vacation to provide a response to Plaintiff's cease and desist letter. (Diepenbrock Decl. (ECF No. 2-2) ¶ 3.) Counsel for the Port later proposed a 48-hour standstill after speaking with Toft. (*Id.*, Ex. B.) At no point

did counsel indicate that the Port CEO or Commission would need to approve any decisions related to the revocation of the license, but instead treated Toft as the final decision-making authority.  This evidence suggests that Toft makes final decisions on behalf of the Port with respect to granting and revoking licenses, or at least with respect to decisions about the use of this specific property.  It is therefore plausible that Toft was the CEO or Commission's designee, and that his actions constitute the policy of the Port.

If Plaintiff is able to establish that it had an irrevocable license and that Toft had the authority to make policy on behalf of the Port, then it is likely to succeed on the merits of its section 1983 claim.

**B.  Irreparable Harm**

Plaintiff has established that there is a likelihood of irreparable harm if the injunction is not issued.  Plaintiff has alleged that it will not be able to reach its rail facilities or operate its transloading activities if it cannot use the Northern Access route.  While there is an outstanding factual issue as to whether Plaintiff can physically access the facilities, Plaintiff has no legal right to do so under the terms of its lease.  Plaintiff has also established that it would be forced to change its current operations if the license to use the North Access is revoked, which would reduce or cease Plaintiff's operations for a period of time.

Further, if Plaintiff is able to establish that its constitutional rights were violated, such a continuing violation of those rights is an irreparable harm.  *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (a finding of irreparable harm "follows inexorably" from a "conclusion that the government's current policies are likely unconstitutional").  And, as explained in the Court's Order issuing the Temporary Restraining Order, if in fact Plaintiff has a property interest in the licensed area, "[i]t is well-established that the loss of an interest in real property constitutes an irreparable injury." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1159 (9th Cir. 2011).

### C. Balance of Hardships

In contrast, Defendants have not articulated a hardship that outweighs Plaintiff's potential harm. First, while Defendant Ramcon has stated that it intends to install drainage on the North Access route, it stated in its Opposition and at oral argument that it does not plan to begin any construction until *after* a final adjudication on the merits of Plaintiff's claims. Accordingly, Ramcon will not be harmed by a preliminary injunction while the claims are adjudicated.

Next, the Port purports that it will be harmed by not generating income through leasing the North Access route. As an initial matter, the Port does not show how it will receive any additional funds if the Court denies the Preliminary Injunction; it is not as though there is another entity willing to pay for the North Access route. Moreover, the Port has not charged for the use of the route since at least 2017 when the license was granted and there is no indication that the Port has a ready leasee. Prior to this litigation, the Parties engaged in discussions whereby Plaintiff agreed to pay the Port's asking rent price of $750, and the Port ultimately reneged on this agreement. (Beard Decl. ¶ 9.) The fact that the Port declined to lease the route to Plaintiff is evidence that the Port does not imminently require those funds.

Because the preservation of the status quo will not harm Defendant Ramcon, and will impose at most a minimal hardship on the Port, the balance of hardships clearly tips in favor of granting the preliminary injunction.

### D. Public Interest

The public interest also weighs in favor of granting the preliminary injunction. Plaintiff is a common carrier which ships supplies for various companies, including for other common carriers. If Plaintiff must substantially cease it shipping activities Plaintiff's customers will be harmed, and the interruption in services may cause other supply stream issues which will affect the public. Further, the tenant leasing Plaintiff's property is performing a public works project on a major California highway. If

Plaintiff is forced to route through the property occupied by Flatiron, it may disrupt Flatiron's operations and impact Flatiron's work on the project.

Defendant the Port argues that its inability to monetize the North Access route will impact its ability to carry out its major operations – rice exports and cement imports – and will affect the employment of 50 employees, both of which will harm the public. As the Court noted above, the potential revenue for the North Access route is minimal, and the Port has thus far not collected income on the property. Accordingly, it is not credible that the preliminary injunction will impact the Port's financial status to such an extent that it will be unable to operate or retain its employees.

The public interest factor therefore favors maintaining the status quo while the merits of the case are adjudicated so that Plaintiff can continue its common carrier shipping activities without impacting Flatiron's involvement in the public works project.

## IV. Conclusion

Plaintiff has established that it is entitled to a preliminary injunction. While there are factual questions, Plaintiffs have provided sufficient evidence to establish, at a minimum, serious questions on the merits, if not a likelihood of success on the merits. Plaintiff has shown that absent the preliminary injunction, it will suffer irreparable injury, that the public interest favors imposing a preliminary injunction, and that the balance of hardships "tips sharply" in Plaintiff's favor. *All. for the Wild Rockies*, 632 F.3d at 1134–35. Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Preliminary Injunction is hereby GRANTED as follows:

Pending the ultimate disposition of this matter, Defendants Sacramento-Yolo Port District (sued here as the Port of West Sacramento) and Ramcon Engineering & Environmental Consulting, Inc., and all those acting in concert with each or both of them, are hereto ordered to cease and desist from preventing or impeding Plaintiff Sierra Northern Railway, its employees, or any of its customers from using the

1 | Northern Access route to SNR's West Sacramento rail yard in order to effect Plaintiff's
2 | transloading operation.
3 |     This order shall take effect immediately.
5 |     IT IS SO ORDERED.
6 | Dated: __**August 7, 2024**__

                                          Hon. Daniel J. Calabretta
                                        UNITED STATES DISTRICT JUDGE

13 | DJC2 – SNR24cv01899.PI